UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

CIVIL ACTION NO. 04-CV-550-KKC

TERRY MOUNCE                                                                    PLAINTIFF

VS:                          **MEMORANDUM OPINION AND ORDER**

MIKE HARRIS, ET AL.                                                          DEFENDANTS

Before the Court for consideration are: (1) the "Motion for Summary Judgment" which the defendants, Mike Harris, Jimmy Wilson, and Evelyn Sullivan, have filed through counsel [Record No. 27]; (2) the "Response" of Terry Mounce, the *pro se* plaintiff [Record No. 34]; and (3) the defendants' "Reply to the Plaintiff's Response for Summary Judgment." [Record No. 39].

FACTUAL BACKGROUND
1. Complaint

The plaintiff is now confined at the Luther Luckett Correctional Complex in LaGrange, Kentucky. On November 9, 2004, he filed a complaint under 42 U.S.C. §1983, asserting Eighth Amendment claims relating to his confinement in the Pulaski County Detention Center ("PCDC").[1] He named as defendants Mike Harris, the Jailer of the PCDC; Major Jimmy Wilson, Operations Manager for Inmate Control of the PCDC; and Evelyn Sullivan, Bookkeeper and Jail Coordinator of the PCDC.[2] The plaintiff asserted two claims under the Eighth Amendment: (1) that the defendants were deliberately indifferent to his serious medical needs, and (2) that the conditions of

_____

[1] The plaintiff was incarcerated at the PCDC in October, 2004, and remained an inmate there until late March, 2005.

[2] The plaintiff did not allege the capacity in which he was suing the defendants.

1

his confinement at the PCDC constituted cruel and unusual punishment.

The plaintiff asserted several different medical claims. First, he alleged that prior to October, 2004, he suffered from numerous medical conditions, the main one concerning medical problems with both of his arms. He alleged that his arms required remedial surgery.[3] Second, he alleged that the defendants failed to ensure that qualified jail officials administered his prescription drugs to him. Third, he alleged that he suffered from Lyme disease and various psychological problems, the latter condition causing him to attempt commit suicide at the PCDC. He claims that the defendants intentionally refused to provide him with proper treatment for those problems.

The plaintiff further challenged the conditions of his confinement at the PCDC, claiming that there was a serious overcrowding issue. He alleges that as result of that problem, he was forced to sleep on a mat on the floor for a month-and-a-half.

## 2. The Opinion and Order

On March 31, 2005, the Court entered a "Memorandum Opinion and Order" and dismissed the plaintiff's §1983 against the defendants in their *individual* capacities [Record No. 10, p. 4]. The Court broadly construed the complaint to assert Eighth Amendment claims against the Pulaski County Fiscal Court, on the basis that it (the Fiscal Court), had a policies or customs of denying appropriate medical treatment to seriously injured or ill inmates at the PCDC, and allowing the PCDC to become overcrowded with inmates. The Court allowed the plaintiff to proceed with his claims for injunctive and monetary relief against the defendants in their *official* capacities, only.

---

[3] The plaintiff stated that he was hit by a train in 2000, and that his left arm was almost severed in that accident. He alleged that he has sustained ongoing and permanent damage to his left arm. He stated that In November, 2001, he fell and broke his right wrist. He alleged that his right arm "had something wrong with it" and that it required surgery.

3.  Discovery

The defendants' counsel took the plaintiff's deposition on June 16, 2005.  They also took the

deposition of Linda Mounce, the plaintiff's wife, on September 17, 2005.  Both transcripts have been

filed in the record [Record No. 28].  The plaintiff did not seek any discovery from the defendants

until December 23, 2005 [Plaintiff's "Motion to Compel," Record No. 35], long after the September

15, 2005 deadline for discovery established in the Court's Scheduling Order [Record No. 21].

Accordingly, the Court denied the plaintiff's motion to compel discovery [Record No. 38].

Defendants' Motion (and Memorandum)
for Summary Judgment [Record No. 27]

1.  Surgery Was Not Warranted

The defendants contend that because they responded to all of the plaintiff's needs for medical

care (both emergency and non-emergency) in a prompt and responsible manner, they were not

deliberately indifferent to his many medical conditions.  They argue that the plaintiff had ignored

medical problems with his arms long before being confined in the PCDC.  Accordingly, they contend

that his medical problems did not create an emergency situation requiring surgery on November 29,

2004, the date that the plaintiff's wife selected for the plaintiff to undergo arm surgery.

Specifically, they allege that Plaintiff's medical records reveal that Dr. Amit Gupta of

Kleinert, Kutz & Associates Hand Care ("K & K") in Louisville, Kentucky, first evaluated the

plaintiff on December 2, 2002, and determined that the plaintiff needed surgery on both arms.

Although surgery was scheduled for March 18, 2003, the plaintiff did not appear for pre-operative

consultation and treatment and the surgery was cancelled.  The same result occurred with regard to

surgical dates scheduled for July 15, 2003, and September 13, 2004, respectively.  All of the dates

3

of these scheduled surgeries predated the plaintiff's confinement in the PCDC.

They  further allege that Linda Mounce waited until the plaintiff was confined in the PCDC to schedule an appointment for her husband with K & K for November 3, 2004.  The plaintiff filed a grievance on November 2, 2004, when he learned that he was not going to be taken to the appointment [Motion, Record No. 27; Exhibit H (11/2/04 Grievance)].  Defendant Major Jimmy Wilson denied the grievance that day because the nurse who handled emergency medical situations was not present.  On November 3, 2004, Linda Mounce called K & K and scheduled the plaintiff's arm surgery for November, 29, 2004 [*Id*., Exhibit I, (K & K Tele. Record)].

According to Defendant Evelyn Sullivan's affidavit, she contacted K & K's office in response to that appointment and was told that the plaintiff had failed to show for three prior pre-operative appointments in 2003 and 2004.  She states that K & K informed her that until they saw the plaintiff, they could not advise the PCDC what medical treatment, if any, was required [*Id*., Sullivan Affidavit, Exhibit J].  Based upon this information, the PCDC declined to release the plaintiff for the surgery, concluding that the plaintiff's arm conditions did not present an emergency medical situation.  The plaintiff filed a second grievance on February 1, 2005, complaining about being denied surgery at K & K.  The PCDC responded  that because the plaintiff did not keep his appointments with K & K *before* he was confined in the PCDC, the PCDC was not going to honor his demand for surgery while incarcerated there [*Id*., Exhibit K (2/1/05 Grievance)].

## 2.  Jail Adopted Policy for Inmate Medical Care

The defendants' second argument challenges the construed claim that the Pulaski County Fiscal Court had a policy in effect through which injured or ill inmates at the PCDC were deprived of necessary medical care.  The defendants note that in his deposition, the plaintiff admitted that he

4

had no idea of what the PCDC's policy about medical care consisted [Plaintiff's Depo., p. 12].

The defendants next argue that not only did the PCDC have a policy in effect for addressing inmate medical concerns, but also that they followed that policy in all respects with regard to the plaintiff. Defendant Sullivan testified in her affidavit that when the plaintiff was first brought to the PCDC, he was provided with a copy of the PCDC's Orientation Form, which contains the PCDC's policies and procedures governing inmate medical care [*Id*., Exhibit J (Sullivan Affidavit, ¶ 8)].[4] The defendants contend that the PCDC's Orientation Form clearly advises all inmates, including the plaintiff when he arrived at the PCDC, that: (1) the nurse's determination governs the course of treatment provided and (2) no inmate is released and transported to another medical provider unless the jail doctor approves such action.[5]

The defendants argue that the PCDC's policy regarding inmate medical care, set forth in the Orientation Form, fully complies with the Eighth Amendment's requirement that inmates be afforded proper, but not unlimited, access to medical care. Noting that the Eighth Amendment has both objective and subjective components which must be satisfied, they first dispute that *objectively*, the plaintiff's pre-existing problems with his arms posed a "substantial risk of serious harm" as defined in *Farmer v. Brennan*, 511 U.S. 835, 834 (1994).

The defendants further argue that under the relevant facts, their conduct did not satisfy the

---

[4] The PCDC's Orientation Form (effective 11/03/03) states in relevant part at page 2:

Inmate shall be provided with a medical request of any medical needs. [We] will decide what action will be taken, except in the case of an emergency which will be decided by the deputy on duty. Medications shall be given four (4) times per day. Sick call is on Monday of each week with other visits to doctors and/or lab work scheduled as needed. . .

[*Id*., Orientation Form (Attachment to Exhibit J, Sullivan Affidavit)]

[5] They also note that Linda Mounce admitted these facts in her deposition. [Linda Mounce Depo., p. 19]

5

subjective component of an Eighth Amendment claim.  The subjective component requires a showing that the complained-of policy or custom was adopted, executed, or implemented with a "sufficiently culpable state of mind."  *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000).  They dispute that the Pulaski County Fiscal Court, in adopting the inmate medical policies contained in the Orientation Form, manifested "deliberate indifference" to inmate health or safety.

 In defending their actions under both the objective and subjective components of the Eighth Amendment, the defendants argue that no medical emergency existed, and that it did not offend the "evolving standards of decency" to refuse to release the plaintiff for a surgical procedure which his wife had unilaterally scheduled for November 29, 2004.  They base that conclusion on the fact that consistent with the PCDC's orientation form, which vests the nurse with authority to determine if a "medical emergency" exists, Defendant Sullivan inquired about the plaintiff's medical status with K & K's office.  In response to her inquiry, she learned that the plaintiff not only failed to appear for three scheduled pre-operative appointments in 2003-2004, but that he also failed to seek *any* follow-up treatment at K & K between December 2, 2002, and October 20, 2004.

The defendants contend that the very fact that Sullivan contacted an administrator at K & K's office in order to investigate the merits of his demand for surgery disproves the plaintiff's construed claim that the PCDC had a policy or custom of deliberate indifference to his serious medical needs.  They characterize Sullivan's contacting K & K's office as confirmation that jail personnel actively investigated the claim, in accordance with the PCDC's policy, and determined that no emergency situation warranting surgery existed.

Finally, the defendants point to other incidents wherein they allege they provided the plaintiff with prompt medical attention to a serious medical need.  On November 13, 2004, the plaintiff cut

6

his wrists while confined in the PCDC.  The defendants note that the plaintiff and his wife admitted that the plaintiff  was  promptly sent to Lake Cumberland Regional Hospital ("LCRH") where he was provided medical attention.  [Plaintiff's Depo., p. 22; L. Mounce Depo., p. 21].  They further note that when the plaintiff complained about sleeping problems on November 29, 2004, the medical staff provided him with the medication Trazadone [Motion, Record No. 27, p. 14].

3.  <u>Plaintiff Did Not Suffer Actual Injury<br>as a Result of PCDC Decision or Policy</u>

Third, the defendants contend that even if the policy was in some or any respect constitutionally deficient under the Eighth Amendment, and the plaintiff was denied prompt medical attention for his arms, he nevertheless did not demonstrate any harm or injury as a result of the delay. The defendants cite *Napier v. Madison County, Ky.*, 238 F.3d 739, 742 (6th Cir. 2001); *Hill v. Dekalb Regional Youth Center*, 40 F.3d 1176, 1188 (11th Cir. 1994) and *Smith v. Franklin County*, 227 F. Supp 667 (E. D. Ky. 2002), for the proposition that when a prisoner alleges a claim based upon a delay in medical treatment, he must place verifying medical evidence in the record establishing the adverse effect of the delay on his morbidity or mortality.

The defendants assert that the plaintiff failed to comply with this requirement.  They note that after the plaintiff was released from the PCDC, he was incarcerated in both the Casey County Jail and the Roederer Correctional Facility.  They cite his deposition testimony in which he states that the Casey County Jail did not provide him with any medical treatment [Plaintiff's Depo., p. 22]. They further rely on the plaintiff's deposition testimony that at that time ( June 16, 2005), he was experiencing the same problems with his left arm (screws popping loose and the need to "defatten" the flap area) that he had experienced in November, 2004 [Plaintiff's Depo., p. 25].  They argue that

7

the plaintiff's testimony on this issue establishes that his arm injury had not, in fact, worsened as result of the PCDC's refusal to release him to surgery on November 29, 2005. They contend that absent any *worsening* of the condition, the plaintiff has not shown any damage or harm.

4.  Plaintiff's Alleged Psychological Problems
Predated Confinement at PCDC

The defendants contend that they are not liable for the plaintiff's alleged psychological damage, stating that any psychological problems he might have existed prior to his confinement in the PCDC. They argue that the plaintiff has not offered any medical evidence that his psychological condition worsened as a result of any policy or custom of the PCDC. They argue that not only did the plaintiff fail to produce any medical evidence substantiating that his psychological well being worsened as a result of having been incarcerated in the PCDC, he also failed to establish by any medical proof that he suffered from any mental conditions prior to being confined in the PCDC.

5.  Plaintiff Abandoned "Overcrowding" Claim

The defendants allege that although the plaintiff initially alleged in his complaint that the PCDC was overcrowded, and that as a result of that condition he was forced to sleep on a mat on the floor, the plaintiff abandoned later that claim in his deposition. They cite the following question and answer from his deposition: "And are you really suing over, I mean, having been made to sleep on the floor." The plaintiff's answer was "No." [Plaintiff Depo., p. 19]

The defendants alternatively contend that even if the plaintiff had not abandoned his claims, the plaintiff failed to demonstrate either that the PCDC had a policy of overcrowding inmates or that the PCDC had in fact been overcrowded at any time other than the time alleged in the complaint. Finally, they allege that requiring an inmate to sleep on a mat on the floor does not violate the Eighth

8

Amendment.  They claim that while it might have been uncomfortable and unpleasant in the short term, it did not constitute either the denial of a basic human need or "the wanton and unnecessary infliction of pain" as described in *Rhodes v. Chapman*, 452 U. S. 337, 347 (1981).

6.  <u>Plaintiff's Other Claims Lack Merit</u>

The defendants challenge the plaintiff's two remaining claims.  First, as to the claim that unqualified PCDC staff (such as guards) dispensed prescription medication, the defendants allege that the plaintiff abandoned that claim in his deposition testimony.  They cite the following question and answer from his deposition:  "And I don't - are you really suing about the guards passing around other people's medication?"  The plaintiff's answer was, "Not really."  [Plaintiff's Depo., p. 33]

They then argue that even if the plaintiff did not withdraw that claim, it is without substance. They refer to the PCDC's official policy regarding drug administration set forth in the Orientation Form.  They submit that the Orientation Form requires only that "medications shall be given four (4) times a day."  [Motion, Record No. 27, Exhibit L, p. 2]  They further respond that the PCDC's policy does not identify who may or may not distribute the medications to inmates, and that it specifically does not prohibit guards from administering medications to inmates.

The defendants challenge the plaintiff's remaining complaint,  that the PCDC "mixed" state and county inmates.  They argue that the plaintiff admitted that he did not know what, if any, policy the PCDC had concerning the housing of co-mingling state inmates with county inmates [Plaintiff's Depo. P. 35].  They note that the plaintiff further testified that he did not know if that action even stemmed from an officially adopted policy, or if, instead, jail employees allowed co-mingling to occur without the knowledge of the Pulaski County Fiscal Court [*Id*.].  They argue that even if there was a co-mingling of inmates, the Pulaski County Fiscal Court is not liable, because a local

9

government cannot be liable for acts of tortfeasors under the doctrine of *respondeat superior*. *Monell v. Department of Social Services*, 436 U. S. 658, 691 (1978).  Finally, the defendants dispute that the plaintiff suffered any actual harm as a result of any alleged co-mingling of inmates.

Plaintiff's Response to the Defendants'<br>Motion for Summary Judgement [Record No. 34]

The plaintiff stated in his response that the defendants were negligent in the handling of his requests for medical treatment.[6]  He took issue with how Defendant Major Jimmy Wilson deferred taking any action in response to his initial November 2, 2004 grievance, on the grounds that the "nurse" had to determine whether there was an emergency, and that the nurse was not available. Plaintiff alleged  that PCDC's practice of not having someone on call at all times in order to decide if a medical emergency existed was a threat to inmate safety and health.

He further argues that it was a violation of his Eighth Amendment rights for PCDC staff  to have determined that he was not in need of surgery on November 29, 2004, as none of them had any medical training and were therefore  not competent to decide what constituted a medical emergency. Plaintiff took issue with the fact that Defendant Evelyn Sullivan waited almost two months after he (plaintiff) missed his November 2, 2004 appointment with K & K before she made any inquiry with K & K about his history and status.  He claims that while the PCDC transported other inmates to non-emergency appointments, he was denied emergency medical treatment.  He claims that PCDC staff unfairly punished him by denying him medical treatment, as evidenced by what he described as their caustic comment in response to his February 1, 2005 grievance:  "Maybe you should have kept your appointments before you came to jail.  You should have kept your appointments prior."

---

[6] The plaintiff filed a two-page response, and attached thereto seven exhibits, all of which the defendants had already attached to their motion for summary judgment.

10

The plaintiff explains why he failed to appear for the three surgeries scheduled by Dr. Gupta. He states that his wife had experienced a problem with Dr. Gupta in connection with her own medical issues, which problems "made them both uneasy with using this doctor for the procedure." [Record No. 34, p. 2]  He further states that at the time the PCDC refused to release him to for the November 29, 2004 surgery, he was in the process of seeing a new doctor at K & K.  Finally, he explains that his experience of being denied medical treatment at the PCDC was so bad that he did not seek medical treatment at any institution where he has since been confined.

### Defendants' Reply to the Plaintiff's
### Response [Record No. 39]

In their response, the defendants argue that the plaintiff failed to carry his burden of demonstrating that a genuine issue of material fact exists.  They address the plaintiff's characterization of the defendants' actions as "negligent."  They argue that under *Farmer v. Brennan*, 511 U.S. at 835, official capacity liability under the Eighth Amendment requires a showing of deliberate indifference to a serious medical need, not mere negligence on the part of a state actor.

Citing *Napier*, 238 F.3d at 742, the defendants reiterated that the plaintiff failed to establish by medical proof that the PCDC's decision not to release him to the surgery (which his wife scheduled for November 29, 2004) had an actual or detrimental effect on his medical condition.  The defendants dispute the plaintiff's claim that while confined in the PCDC, he purportedly began treatment with a new hand surgeon at K & K, Dr. Moreno.  They note  that the plaintiff had never seen Dr. Moreno either before he was confined in the PCDC or, obviously, while he was confined in the PCDC [Reply, pp. 3-4].  The defendants note that the plaintiff has not undergone any surgery during the past seven months in which he has been confined at Luther Luckett Correctional Facility.

11

The defendants maintain that just because the plaintiff subjectively believed that he needed surgery, the PCDC did not violate the Eighth Amendment by refusing to comply at its expense with the plaintiff's demand.  The defendants assert that there is no constitutional requirement entitling an inmate to a course of medical treatment of his own choosing, and that a mere disagreement with how a prison dispenses medical treatment does not amount to an Eighth Amendment violation. They again state that the plaintiff saw Dr. Gupta only one time, on December 2, 2002, and that he failed to appear for three scheduled surgeries.  Given that fact, the defendants argue that they neither subjectively nor objectively acted with deliberate indifference to the plaintiff's health by denying his demand for immediate surgery on November 29, 2004.

The defendants disagree with the plaintiff's interpretation of Defendant Major Jimmy Wilson's response to the plaintiff's November 2, 2004 grievance.  The defendants dispute that Wilson said that the nurse was "unavailable," but that he instead stated:  "Mr. Mounce, I'm sure if it was life threatening the nurse would see that you get medical attention, however, all medical is up to the nurse, unless it is in a case of a emergency and the nurse is not here."  Finally, the defendants briefly restated their arguments that the plaintiff did not demonstrate the existence of any policy of the PCDC, or the Pulaski County Fiscal Court, which condoned either the overcrowding of the PCDC or dispensation of medications in a manner which would endanger inmates.

DISCUSSION
### 1. Summary Judgment Standard

The proper standard for entry of summary judgment is well known.  Federal Rule of Civil Procedure 56(c) provides, in pertinent part, as follows:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

12

> show that there is no genuine issue as to any material fact and that the moving party
> is entitled to judgment as a matter of law.

*Id.*  The moving party bears the initial burden of establishing an absence of evidence to support the non-moving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To meet this burden, the moving party may rely on any of the evidentiary sources listed in Rule 56(c) or may merely rely upon the failure of the non-moving party to produce any evidence which would create a genuine dispute for the jury.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989).  Essentially, a motion for summary judgment is a means by which to challenge the opposing party to "put up or shut up" on a critical issue.  *Id.*

Once the moving party has met its burden of production, the non-moving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint to defeat the motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere presence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.  Summary judgment is properly granted if the party who would bear the ultimate burden of proof at trial fails to establish an essential element of the claim.  *See Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. at 322-23).

The Court has carefully examined the entire record in order to determine whether the plaintiff "has set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 256.  For the reasons set forth herein, the Court concludes that because the record is insufficient to reasonably support a jury verdict in favor of the plaintiff, the defendants' motion for summary judgment will be granted.  *Street*, 886 F.2d at 1477.

## 2.  PCDC Policy Does Not Facially
### Manifest Deliberate Indifference to Inmates

The PCDC's policy regarding medical treatment to inmates is set forth in the Orientation Form, which the plaintiff received when he was first incarcerated at the PCDC [Record No. 27, Motion, Exhibit L].  In it, the PCDC reserves the right to decide what, if any, medical action will be taken in a particular case, except in the case of an emergency which is to be determined "by the deputy on duty."  [*Id*.]  As the defendants correctly note, because the claims asserted against them are in their official capacities, the claims are essentially against the entity of which the defendants are agents.  *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).  In this case, the  governing body for whom the defendants are agents is presumably the Pulaski County Fiscal Court.

Citing *Monell*, 436 U.S. at 694, and *Oklahoma City v. Tuttle*, 471 U.S. 808, 818 (1985),  the defendants further correctly assert that a governmental entity is liable under §1983 only when the entity itself is the moving force behind the alleged deprivation.  The first question then becomes: is the PCDC's policy regarding medical treatment for inmates deliberately indifferent to the inmates' serious medical needs, such that inmates at the PCDC are subjected to the unnecessary and wanton infliction of pain?  The Court is unable conclude that PCDC's medical policy in the Orientation Form is deliberately indifferent to inmates' (including the plaintiff's) serious medical needs.

It is not unreasonable for a jail administration to reserve the authority to decide what medical treatment, if any, it will render to its inmates, as long as the decision does not result in the unnecessary and wanton infliction of pain.  *Estelle*, 429 U.S. 97, 104 (1976).  The provision of medical care is a significant concern to any correctional facility, both from a staffing and budgetary perspective.  "Running a prison is an inordinately difficult undertaking that requires expertise,

14

planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration . . . has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have. . . additional reason to accord deference to the appropriate prison authorities." *Turner v. Safley*, 482 U.S. 78, 84 (1987).

The Supreme Court has further stated that execution of policies and practices regarding the operation of jails and prisons are "considerations peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are serious. *Hudson v. McMillan*, 503 U.S. 1, 2 (1992). Accordingly, the PCDC's medical policy stated in the Orientation Form was a reasonable one.

### 3. Objective Analysis: Plaintiff Was Not Subjected to Substantial Risk of Serious Harm

The second question for the Court to determine is: under both the subjective and objective components of the Eighth Amendment, was the PCDC's decision to deny the plaintiff's release for surgery on November 29, 2004, an act of deliberate indifference to the plaintiff's serious medical needs? The Court concludes that based upon the greater weight of the evidence in the record, it was not. Under the objective analysis, the plaintiff must show that the decision subjected him to a "substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. at 834.

15

According to the deposition testimonies of the plaintiff and his wife, and the many medical records filed in this proceeding, there is no question that in 2001 the plaintiff sustained a serious injury to his left arm.  It was almost severed by a moving train, and he had to undergo a serious graft operation at Vanderbilt University Hospital in order to save his left arm.  Likewise, the record confirms that the plaintiff had experienced problems with his right wrist, which problems resulted from a previous fracture.  The record documents, however, that the plaintiff was not subjected to a substantial risk of serious harm, or to wanton and unnecessary infliction of pain, simply because the PCDC refused to honor his demand to be released for surgery on November 29, 2004, a month after he was confined in the PCDC.

The Court bases this conclusion on several facts.  PCDC personnel denied the request to release the plaintiff for surgery (at its expense) based upon the fact that they construed the plaintiff's own actions as inconsistent with his claim that the condition of his arms, the left in particular, was so deteriorated and grave that immediate surgery was required in November, 2004.  Evelyn Sullivan learned from contacting K & K that the plaintiff enlisted the advice and surgical services of Dr. Amit Gupta on December 2, 2002 (almost two years before he was  first confined in the PCDC).  She was told that he failed to appear for not one, but *three* surgeries which Dr. Gupta had scheduled for March, 2003; July, 2003; and September, 2004.

Given that information from K & K, it appeared to PCDC staff that based upon the plaintiff's objective and continued disregard for the course of treatment (remedial surgery) which Dr. Gupta had prescribed, the plaintiff *himself* did not consider his left arm condition as one which was subjecting him to "substantial risk of serious harm" through and including September, 2004.  Just after the plaintiff became a ward of Pulaski County, however, Linda Mounce contacted K & K to

16

schedule a November 3, 2004 appointment for her husband.  When the PCDC did not present the plaintiff at K & K for the November 3, 2004 appointment, she contacted K & K again, this time to obtain a November, 29, 2004 surgery date.   By this time, Dr. Gupta had left K & K, and his replacement, Dr. Rodrigo Moreno, was to have performed the surgery.  As the defendants point out, Dr. Moreno had never examined the plaintiff.

The plaintiff, in his response to the motion for summary judgment, and his wife, in her deposition testimony, offer an explanation for the plaintiff's non-appearance at three surgical procedures which Dr. Gupta had scheduled.  On review of the record, the Court finds that this explanation is insufficient to create genuine issue of material fact for trial.

Linda Mounce testified that she did not want Dr. Gupta to operate on her husband because she believed that he (Dr. Gupta) had contaminated with Hepatis C during a prior surgical procedure he had conducted on *her* [Linda Mounce Depo., p. 35].[7]  She testified that Dr. Gupta had operated on her in October, 2003, and that during that procedure she contracted Hepatitis C and encountered significant problems [*Id*., p. 33 (Lines 12-19)].[8]

Linda Mounce testified that she and her husband did not want Dr. Gupta to perform the surgery.  She claims that on every occasion they requested the services of another doctor at K & K, their request went unheeded and Dr. Gupta remained on the case over their objection [*Id*., p. 41].

---

[7] Linda Mounce testified that she was born with only one arm [*Id*., p. 33]. She tetsified that on October 8, 2003, she underwent surgery. She stated as follows:  "On October 23, 2003, I had  pancreatitis and dor- -and borderline diabetic stuff going on, so my doctor called me back in."  [*Id*.].

[8] She testified as follows:  " . . .and now I went through the liver biopsy.  I had to clean up after Hepatitis C where I got contaminated in surgery."[*Id*., pp. 35-36].  She then corrected her testimony as to the date that Dr. Gupta had operated on her, clarifying that he had actually performed the surgery on her one year before,  in October, *2002* [*Id*. p. 36, Line 14].

17

However, the K & K records do not indicate that plaintiff requested the services of another doctor in that practice. She further testified that when Dr. Gupta left K & K in September, 2004, she believed that his replacement, Dr. Moreno, was competent to operate on her husband [*Id.*].

### a. Simon & True Medical Reports

That explanation, standing alone, might have given the Court some pause. Considered in light of the other contradictory medical evidence filed in this case, however, it does not create a genuine issue of fact. Attached to Linda Mounce's deposition transcript [Record No. 28] are various sets of medical records and reports. Of relevance is a thick set of medical records from Simon & True Medical Consultants of London, Kentucky. Various physicians in that office consulted with and examined the plaintiff on ten occasions, all of which predated his confinement in the PCDC: November 18, 2003; December 17, 2003; January 15, 2004; February 19, 2004; March 18, 2004; April 20, 2004; May 18, 2004; June 18, 2004; July 23, 2004; and August 20, 2004.

There is at least a four-page report from Simon & True for each of these dates. These records mention the injury to the plaintiff's left arm; the fact that he had problems with that arm; and the fact that arm surgery was discussed as an option. None of the records from Simon & True indicate that the plaintiff was in jeopardy of serious bodily harm or injury unless he *immediately* underwent surgery on either or both arms, even as close in time as two months before the plaintiff became an inmate at the PCDC. The ten reports indicate that the plaintiff consistently complained as much about upper and lower back pain as he did about problems with his arms.[9]

Significantly, the Simon & True medical records do not mention that the plaintiff had been

---

[9] In the January 15, 2004 notes, the "Chief Complaint" was listed as "Chronic low-back pain which radiates into the left leg." Entries for other dates reveal that back pain was listed as the chief complaint along with arm pain.

evaluated by Dr. Gupta, or that Dr. Gupta had scheduled the plaintiff for surgery on three dates.  It is logical to assume that if these doctors had been told that fact, they would have noted it somewhere in the records.  There is no mention in the Simon & True reports that the plaintiff and his wife were concerned about the prospect of Dr. Gupta operating on the plaintiff, given the alleged contamination Linda Mounce claims she experienced at Dr. Gupta's hands in 2002.  There is  no mention in these records indicating that the plaintiff requested the name of another arm surgeon, given his alleged concerns about Dr. Gupta's capabilities.

The fact that the Simon & True medical records contain no mention for ten months concerning the plaintiff's lack of confidence in Dr. Gupta's competence deflates his explanation of why he did not appear for the surgeries.  The Simon & True records do not indicate that absent immediate surgery, the plaintiff was in jeopardy of a substantial risk of serious harm.  These facts lead the Court to the conclusion that while the plaintiff had problems with his arms, his conditions did not suddenly require "emergency" surgery on November 29, 2004, at the expense of the PCDC.

### b.  Lake Cumberland Regional Hospital Records

Linda Mounce also supplied the Court with the plaintiff's medical records from LCRH. Some of those records predate his confinement in the PCDC, and some pertain to his attempted suicide at the PCDC on November 13, 2004.  The records which predate his confinement in the PCDC all appear to have been generated between July 31, 2003, and August 6, 2003.[10]  The plaintiff was hospitalized for a week because he had attempted suicide.  Dr. Anjum Iqbal stated as follows in one report:

---

[10] They consist of:  (1) a complete, three-page "Consultation Report"; (2) pages 1, 3 and 4 of a "History and Physical Examination Report"; and (3) a complete "Discharge Summary."

"The patient needs to follow up with Vanderbilt where he had his initial surgery for further recommendations regarding his soft tissue growth of his left arm."

[LCRH Consultation Report, 7/31/03] [11]

Dr. Syed Umar stated as follows in another report:

"Dr. Parson was consulted who asked the patient to go back to Vanderbilt Hospital in Nashville where original surgery was performed. The patient agreed to that plan.

[LCRH Discharge Report, 8/6/03]

Again, while his arm injuries were mentioned as an integral part of his medical history, neither Dr. Umar nor Dr. Iqbal indicated that the plaintiff was facing a substantial risk of serious injury unless he underwent immediate surgery on his arms. They recommended that he have surgery, but they did not indicate that it was imminently necessary. Moreover, neither the plaintiff nor his wife testified or offered any medical proof that after being discharged on August 6, 2003 (over one year *before* his confinement in the PCDC), the plaintiff followed these doctors' advice and contacted Vanderbilt University medical staff as the LCRH doctors had recommended.

The undisputed medical evidence in the record, from both Dr. Gupta and the LCRH, reflects that the plaintiff would benefit from additional arm surgery. The totality of these medical records does not, however, indicate that the PCDC's failure to underwrite the expense of that surgery, on a date selected by the plaintiff's wife, exposed the plaintiff to a "substantial risk of serious harm." As the defendants noted, there is no constitutional requirement entitling an inmate to a course of medical treatment of his own choosing. *Estelle v. Gamble*, 429 U.S. at 107, and *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). A mere disagreement with how a prison dispenses medical treatment

---

[11] In the "Physical Examination" section of the "Consultation Report," Dr. Iqbal noted as follows: "This young male in no acute distress sitting in the chair."

does create an Eighth Amendment violation.  *Westlake v. Lucas*, 537 F.2d at 860 n.5.

### 4.  Subjective Analysis: Defendants Lacked
### Sufficiently Culpable State of Mind

The Court agrees with the defendants that neither Major Jimmy Wilson's actions in denying the November 2, 2004 grievance, nor Evelyn Sullivan's actions in denying the February 1, 2005 grievance constituted evidence of a "sufficiently culpable" state of mind.  Sullivan merely informed the plaintiff that the nurse who would decide emergency request was not there.  That grievance was filed only one day prior to the November 3, 2004 appointment which the plaintiff's wife scheduled.

Sullivan's actions in contacting K & K to ascertain the plaintiff's status was reasonable.  As stated, based upon the information relayed to Sullivan by K & K, her action in denying the plaintiff's grievance did not constitute either "deliberate indifference" or an "excessive risk" to the plaintiff's health and safety in violation of the PCDC's policies.  *See Farmer*, 511 U.S. at 834.  Since the plaintiff *himself* did not treat the medical conditions affecting his arms as conditions requiring immediate surgery, it is unreasonable to have expected  the defendants to have done so, either.

### 5.  Plaintiff Failed to Prove Damage As a
### Result of the PCDC's Decision

The Court will briefly address this issue.  Just as the plaintiff failed to demonstrate that the PCDC's failure to release the plaintiff to undergo surgery, on a date selected by the plaintiff's wife, subjected the plaintiff to a "substantial risk of serious harm," he also failed to prove by convincing medical proof that the PCDC's action had an actual or detrimental effect on his medical condition. This is the requirement.  *See Napier*, 238 F.3d at 742.

As part of her deposition testimony, Linda Mounce presented two letters from Dr. Moreno's administrative staff dated December 3, 2004, and January 7, 2005, respectively.  These two letters

21

were addressed to a Somerset attorney by the name of Marcus Vanover.  A third letter, dated

February 15, 2005, was from Dr. Moreno and was addressed directly to the plaintiff.

In the first two letters, Dr. Moreno's staff indicated that Dr. Moreno was of the opinion that

the plaintiff needed the surgery to his arms, described in the January 7, 2005 letter as "a hypertrophic

non-union of the left ulna and a right schaphoid non-union."  In his February 15, 2005 letter, Dr.

Moreno stated that "*Dr. Gupta* has indicated that you require surgery for a hypertrophic non-union

of the left ulna and a right schaphoid non-union.  *In order for me to evaluate your condition*, an

appointment has been scheduled for March 23, 2005 at 1:45 pm." (Emphasis added).

The first two letters do not create a genuine issue of material fact in light of Dr. Moreno's

own letter of February 15, 2005.  In that letter, he stated only that he would need to see the plaintiff

in order to independently determine if surgery was still needed.  Dr. Moreno carefully noted only that

*Dr. Gupta* had indicated that surgery was necessary.  Dr. Moreno did not conclude in his letter that

*he* (Dr. Moreno) was of the opinion that surgery was necessary:  he stated that he would first need

to evaluate the plaintiff himself before making a decision.  Under *Napier*, this is insufficient

evidence that the PCDC's action had an actual or detrimental effect on the plaintiff's arm conditions.

As for the plaintiff's claim that the PCDC's actions worsened his mental/psychological

conditions, the medical records refute that contention.  As documented by the July 31 - August 6,

2003 medical records from the LCRH, the plaintiff was suicidal before his confinement at the PCDC.

Although confinement in any type of correctional facility is generally never desirable or, for that

matter, a pleasant experience, the plaintiff produced no medical proof that confinement in the PCDC

*worsened* his suicidal tendency.  In support of this claim, the plaintiff stated in his deposition only

that Major Jimmy Wilson provided him with a razor, failed to supervise him, and instructed him to

22

cut upwards, not across.  This mere allegation is, at best, "the mere presence of a scintilla of evidence" as discussed in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252, and is insufficient to establish a genuine issue of material fact.

Additionally,  upon the discovery of the plaintiff's attempted suicide on November 13, 2004, the PCDC transported the plaintiff to the LCRH for treatment.  Furthermore, the medical records show, and the plaintiff's wife admitted,  that when  the plaintiff needed something to sleep, the nurse told him she would could give him up to 50 milligrams of Benadryl, and to let her know [Linda Mounce Depo. p. 43].  Such action does not establish deliberate indifference to a serious medical need; it establishes attention to a his medical needs.

### 6. Plaintiff's Other Claims Lack Merit
### a. Sleeping On Mattress

The plaintiff's three remaining claims fail to state a claim upon which relief can be granted. In his deposition, the plaintiff appears to have withdrawn the claim that the PCDC overcrowded inmates [Plaintiff Depo., p. 19].   Even if he had not, he would not have a valid claim.   The deprivation of Eighth Amendment rights must be "sufficiently serious" such that the prison officials' acts or omissions objectively result in the denial of "the minimal civilized measure of life's necessities."  *Farmer v. Brennan*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991), and *Rhodes v. Chapman*, 452 U.S. at 347).

At best, sleeping on a mattress was an uncomfortable inconvenience, but it did not amount to a condition which imposed "an atypical and significant hardship . . . in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 483-83 (1995).  *See Perkins v. Kansas Department of Corrections,* 1997 WL 383072 (D. Kan. June 9, 1997) (Only Westlaw citation is

currently available) (fact that prisoner had to sleep on mattress that was on the floor and had no table on which to sit or eat did not violate the Eighth Amendment).  "The federal courts may not intervene to remedy conditions that are merely unpleasant or undesirable."  *Neal v. Miller*, 778 F. Supp. 378, 383 (W. D. Mich. 1991).  *See also Abdur-Reheem-X v. McGinnis*, 198 F.3d 244, 1999 1045069, **3 (6th Cir. (Mich.) November 12, 1999) (Table) (Unpublished Disposition) ("The Eighth Amendment protects Abdur-Reheem-X from conditions of confinement that are health threats; it does not shield him from conditions of confinement that cause mere discomfort).  That claim is dismissed.

### b.  Co-Mingling of Inmates

Second, the plaintiff offers no evidence that the alleged co-mingling of state and county inmates caused him any injury.  "Jurisdiction depends upon a finding that plaintiff 'has suffered some threatened or actual injury resulting from the putatively illegal action . . . .'"  *Briggs v. Ohio Elections Comm'n.*, 61 F.3d 487, 491 (6th Cir. 1995) (citing *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 (1973))).  That claim is dismissed.

### c.  Dispensation of Medications

There is nothing in the PCDC's Orientation Form prohibiting guards from administering medications.  Additionally, the plaintiff admitted in his deposition that none of *his* medications were distributed by the guards [Plaintiff Deposition, p. 32].  He complains about an alleged action which did not affect him in any manner.  Clearly, a plaintiff must demonstrate an injury as the result of an alleged deprivation.  *Briggs v. Ohio Elections Comm'n.*, 61 F.3d at  491.  That claim is dismissed.

### CONCLUSION

Accordingly, it is **ORDERED** as follows:

(1)      The defendants' "Motion for Summary Judgment" [Record No. 27] is **GRANTED**.

(2)    The plaintiff's claims against the named defendants in their official capacities are

**DISMISSED** with prejudice.

(3)    This action is **DISMISSED** with prejudice, and Judgment shall be entered

contemporaneously with this memorandum opinion in favor of the named defendants.

(4)    All pending court dates and motions are SET ASIDE as moot.

Dated this 17th day of January, 2006.

**Signed By:**

**_Karen K. Caldwell_**   *KKC*

**United States District Judge**

25